Filed 10/2/23  In re J.Z. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re J.Z., a Person Coming Under the Juvenile Court Law. | D082222 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. J520546A) |
| Plaintiff and Respondent, | |
| v. | |
| C.Z., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael P. Pulos, Judge.  Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel and Natasha C. Edwards, Deputy County Counsel, for Plaintiff and Respondent.

C.Z. (Mother) appeals from the juvenile court's order terminating parental rights over her now 11-year-old son J.Z. She argues the juvenile court erred in declining to apply the beneficial relationship exception under Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i).[1] We affirm.

FACTUAL AND PROCEDURAL BACKGROUND[2]

J.Z. lived with Mother, her boyfriend G.W., and infant half-sibling G.W.Z. Mother and G.W. had a three-year history of domestic violence and alcohol abuse. J.Z. witnessed some of these incidents, suffered with enuresis, and told a social worker that during the incidents "he got scared, as his body would not move and he opened his eyes wide." On August 31, 2020, Mother and G.W. engaged in a verbal and physical altercation that required police intervention. Mother left the family home with J.Z. and G.W.Z. and moved in with the maternal grandparents.[3]

Mother and G.W. obtained temporary restraining orders (TROs) against each other and a social worker provided each parent with a written safety plan. However, Mother and G.W. decided to continue their relationship, cohabitate with the children, and dismissed their TROs. They

---

[1]   Undesignated statutory references are to the Welfare and Institutions Code.

[2]   Because our discussion addresses the relationship between Mother and J.Z., in the interest of brevity, we omit most of these details here and instead provide an outline of the proceedings leading to the court's finding that the beneficial relationship exception did not apply.

[3]   Mother's oldest son, D.Z., age 14, has lived with the maternal grandparents since age 12.

also refused to participate in voluntary services. On October 1, 2020, the maternal grandfather called the police and the San Diego County Health and Human Services Agency (the Agency) after J.Z. did not want to return home to Mother. A social worker met with J.Z., and he agreed to stay with Mother after the social worker told him she would speak to Mother about not yelling at J.Z. and allowing J.Z. to stay with someone else if she decided to drink. At a Child Family Team meeting the following week, Mother and G.W. denied abusing alcohol or needing domestic violence services and declined to participate in voluntary services.

The Agency obtained a protective custody warrant for J.Z. and filed a section 300, subdivision (b) petition alleging Mother and G.W. engaged in ongoing domestic violence in front of J.Z.[4] At the detention hearing on October 16, 2020, the juvenile court found a prima facie showing had been made that J.Z. was described by section 300, ordered him detained with the maternal grandparents, and ordered supervised visitation for Mother. At a jurisdiction and disposition hearing in November 2020, Mother's counsel informed the court that she had started therapy, domestic violence classes, was attending A.A. meetings and would set up therapy sessions for J.Z. J.Z.'s counsel informed the court that J.Z. did not want contact with G.W.

The contested jurisdiction and disposition hearing took place in January 2021. The juvenile court sustained the petition, removed J.Z. from Mother's care, ordered family reunification services for Mother, and ordered no contact between J.Z. and G.W. In July 2021, Mother and J.Z. started

---

[4]    The Agency also filed a petition on behalf of G.W.Z. G.W.Z later reunified with Mother and G.W. and the juvenile court terminated jurisdiction. J.Z.'s alleged father, W.B., was not involved in J.Z.'s life and did not participate in the proceeding.

unsupervised visits. Mother and J.Z. also started conjoint therapy but this ended after one session because the therapist believed "there was no benefit for them to engage" and it was not in J.Z.'s best interest to continue therapy because J.Z. did not feel safe doing therapy with Mother.

At the contested six-month review hearing in October 2021, the juvenile court continued J.Z. out of Mother's home and ordered further reunification services to Mother. At the contested 12-month review hearing in February 2022, the social worker testified that Mother did not validate J.Z.'s feelings, called him a liar, and blamed him for the dependency proceeding. At the end of the hearing, the court ordered additional services for Mother. At a combined 12- and 18-month review hearing in August 2022, Mother submitted on the Agency's recommendations to terminate services and the court set a section 366.26 hearing. In September 2022, Mother gave birth to another child.

At the contested section 366.26 hearing in May 2023, the court received into evidence some of the Agency reports and Mother presented no affirmative evidence. Mother's counsel advocated for a lesser permanent plan based upon J.Z.'s relationship with her and his younger siblings. J.Z.'s counsel and guardian ad litem noted J.Z.'s presence at the hearing and asked the court to order adoption for J.Z. The juvenile court found by clear and convincing evidence J.Z. would likely be adopted should parental rights be terminated. It found Mother visited regularly but concluded that J.Z. would not benefit from continuing his relationship with Mother. It noted that J.Z. did not always want to visit Mother or look forward to visits and "there is a sense he goes because the court says he has to." The court found that Mother and J.Z.'s interactions had "notes of positivity," but that "negativity [took] a predominant role" noting, "[t]he anxiety, the fear, the stress, the combative

4

sort of tit for tat. . . ." Even assuming a substantial positive emotional relationship existed, the court found Mother did not prove terminating the relationship would be detrimental to J.Z.

DISCUSSION

A. *General Legal Principles*

During a section 366.26 hearing, the juvenile court must choose one of three permanent plans: adoption, guardianship, or long-term foster care. (§ 366.26, subd. (b).) Of these options, "[a]doption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) When the court finds by clear and convincing evidence the child is adoptable, "the court shall terminate parental rights and order the child placed for adoption" unless a statutory exception applies. (§ 366.26, subd. (c)(1).) The parent has the burden of "show[ing] that the termination of parental rights would be detrimental to the child under one of the exceptions" to adoption. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.)

One of the statutory exceptions to the preference for adoption is the parental-benefit exception. (§ 366.26, subd. (c)(1)(B)(i).) This exception applies where "[t]he court finds a compelling reason for determining that termination would be detrimental to the child," including where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subds. (c)(1) & (c)(1)(B)(i).) As the California Supreme Court has said, this exception "preserves [a] child's right to [a] relationship [with his or her parent] even when the child cannot safely live with that parent. What it does not allow is a judgment about the parent's problems to deprive a child of the chance to

5

continue a substantial, positive relationship with the parent. (*In re Caden C.* (2021) 11 Cal.5th 614, 643 (*Caden C.*).)

For the beneficial relationship exception to apply a parent must show by a preponderance of the evidence (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) A "crucial aspect of the [juvenile] court's responsibility" at the section 366.26 hearing is deciding "whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. By making this decision, the [juvenile] court determines whether terminating parental rights serves the child's best interest." (*Caden C.*, at pp. 631–632.)

We review the first two elements of the test for substantial evidence and the third for an abuse of discretion. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) In reviewing for substantial evidence, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists. (*Id.* at p. 640.) In reviewing for an abuse of discretion, a juvenile court abuses its discretion by making an arbitrary, capricious, or patently absurd determination. (*Id.* at p. 641.)

B. *Analysis*

Mother contends she proved all three elements of the beneficial relationship exception. The juvenile court found that she met the first

element set forth in *Caden C.*, *supra*, 11 Cal.5th 614, consistent visitation with J.Z. This finding is unchallenged. Mother challenges the court's findings that she did not meet her burden of proving the second and third elements—that a "substantial, positive, emotional attachment to the parent" existed and "terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Id.* at pp. 636–637.)

With respect to the second element, Mother asserts that determining whether J.Z. has a substantial, positive, and emotional attachment to her requires broader analysis than merely determining whether she interacts with J.Z. more negatively than positively. She also contends the primary focus on whether interactions are negative should not be from the child's perspective even when the child is an intelligent 11-year-old child like J.Z. We agree with Mother that this element requires a broader analysis than examining whether most of her interactions with J.Z. are positive or negative. However, we disagree with her argument that the primary focus of this inquiry should not be on the child.

In evaluating the second element, courts "assess whether the 'child would benefit from continuing the relationship.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) "Again here, *the focus is the child*. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on the child, even as courts must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern. . . ."

(*Ibid.*)  A positive attachment between child and parent "is necessarily one that is not detrimental to the child but is nurturing and provides the child with a sense of security and stability." (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230, italics added.)

Here, the record shows J.Z. does not have a substantial, positive emotional attachment to Mother.  J.Z. spent the first nine years of his life with Mother.  When removed from her care, J.Z. informed the social worker he did not want to live with Mother and G.W., liked living with his grandparents, and felt safe with them.  By the time of the section 366.26 hearing, J.Z. had been out of Mother's care for over  two and one-half years.  During her visits with J.Z., Mother was not overtly inappropriate, she brought food, talked to him about different subjects, and played cards or board games with him.  In March 2021, over a year after his detention, J.Z.'s counsel informed the court that J.Z. would "visit Mother if he ha[d] to."

By the time of the July 2021 status review report, Mother's visits with J.Z. progressed from supervised to unsupervised twice weekly for at least three hours.  Less than one month later, J.Z. asked the social worker if he could visit Mother only once a week instead of twice weekly.  Despite this request, his visitation with Mother expanded to four days a week unsupervised for three hours after school.  After this occurred, J.Z. told the social worker he preferred supervised visits at the park where he felt safe because someone was there with him in a public place.  He claimed he did not want to get in the car with Mother because she drove fast, smelled of alcohol, and used bad words.  J.Z. reported he was "terrified" to spend the night at Mother's house because he thought she would drink and start fighting with G.W.  He reported that his stomach hurt when he thought about this because no one listened to how he felt.

8

J.Z. was present with counsel for the pretrial status conference for the contested 12-month review hearing in early February 2022. Counsel for the Agency reported that J.Z. called the social worker daily because he was having physical and emotional reactions to unsupervised visits with Mother and did not feel safe with her. The juvenile court reverted the visits to supervised for two hours, twice a week.

The social worker testified at the contested 12-month hearing in late February 2022, stating Mother "doesn't validate [J.Z.'s] feelings. She blames and shames him. She says that CPS throws kids away. She showed him adoption paperwork saying, here, this is your name on here, if you don't come home with me, you're going to the adoption center." The social worker expressed concern that Mother blamed J.Z., claimed J.Z. lied and was at fault for the dependency proceeding, "You know, just it's a lot of blame and shame . . . ." Significantly, J.Z. told the social worker he "just look[ed] happy" during visits and did not "want to visit [Mother] anymore." At the end of the hearing, the court ordered additional services for Mother, noting "the gap we're trying to bridge here is validating [J.Z.'s] feelings. And the difference, and I want to be clear about this, about this and [G.W.Z.'s] case, is the emotional distress that [J.Z.] is feeling." The court then admonished Mother to listen to J.Z.[5]

About six months later, Mother still could not consider J.Z.'s feelings, she claimed the Agency gave J.Z. the power to be a " 'brat' " and this was why he refused to return home. Later that month, at the combined 12- and 18-

---

[5] Although Mother claimed parental alienation by the grandparents, the social worker investigated this allegation and rejected it stating, based on her monthly compliance visits, she observed that the grandparents always encourage J.Z. and spoke good about Mother.

month review hearing, J.Z.'s counsel stated, "[J.Z.] would just like for his mother to please be sensitive to comments she might make at visitation and how it might affect him and I would just ask that the Agency make sure to supervise appropriately." At a pretrial status conference in March 2023, when J.Z. learned his visits with Mother would continue he became upset and did not want to attend his scheduled visit. At the next visit the following week, J.Z. asked the visitation monitor to intervene if Mother mentioned the court proceedings or the fact he had cancelled last week's visit.

Notably, J.Z. suffered from enuresis after visiting Mother. He told the social worker that he wet the bed because he was scared and "it only happens when I see my mom, I get nightmares." J.Z. described feeling nervous after visiting Mother. The grandmother noticed this and opined Mother had conversations with J.Z. that affected his self-esteem. J.Z. reported Mother called him "fat" during visits and frequently told him to not "stuff" his face or mouth with food. J.Z. told the social worker his visits with Mother were "ok" but reported that Mother said mean things such as "tell[ing] me to stop stuffing my face and not in a nice, kind way." The social worker observed that when she spoke to J.Z. about returning to Mother he was nervous and his leg shook. In contrast, when J.Z. was with his grandparents, even if the social worker spoke to J.Z. alone, he is "[v]ery . . . calm and just a happy kid."

In summary, Mother and J.Z. have a relationship based on their nine years of shared experiences. Nonetheless, the nature and quality of this relationship does not compel a finding that Mother met her burden of establishing J.Z. had a substantial, positive emotional attachment to her that would be beneficial to him to continue. Mother's failure to meet her burden as to the second element under *Caden C.* was reason alone for the juvenile court to find the beneficial relationship exception inapplicable. Nonetheless,

10

we address—and reject—her arguments concerning the third element, which required her to show that termination of her rights would be detrimental to J.Z. such that "it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

The juvenile court properly assumed for purposes of this analysis that the relationship between Mother and J.Z. would be permanently severed if it ordered adoption. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Even so, it found by clear and convincing evidence that it was in J.Z.'s best interest to be adopted and severing parental rights would not be detrimental to J.Z. Mother points to no specific evidence suggesting it would be detrimental to J.Z. to sever their relationship. Rather, she notes J.Z. was saddened when he was informed she would no longer be his mother and claims the appropriate plan should be guardianship. J.Z., however, understood what adoption meant stating, "it means I would live with my grandparents and they would be my parents.["] When asked if he wanted to be adopted he stated, "yes, because I don't want to live with my mom *or be with her*." (Italics added.)[6]

---

[6] Mother suggests that J.Z.'s religious practices as a Jehovah's Witness played a role in his relationship with her. We do not disagree with this suggestion but observe that rather than respecting J.Z.'s different religious beliefs, Mother used religion to create a barrier between them. For example, when J.Z. asked Mother why she could not bring his younger siblings to visit Mother responded, "Because they aren't the same religion." Mother asked J.Z. about dressing up for Halloween although she knew J.Z. did not celebrate Halloween due to his religious beliefs. When Mother and J.Z. began to discuss religion, the social worker observed that J.Z. attempted to change the conversation. J.Z. told the social worker that he has strong feelings about his faith and asked Mother to not discuss his faith because she "just wants to make fun of me or tease me about my beliefs."

A court may choose a permanent plan " 'other than the norm, which remains adoption' " only " 'in exceptional circumstances.' " (*Caden C., supra*, 11 Cal.5th at p. 631.)  There are no such exceptional circumstances here.  J.Z. experienced stability for approximately two and one-half years with caregivers who loved him and wanted "to ensure [he grew] up in a safe and nurturing environment and ha[d] a great adulthood."  The record supports the juvenile court's conclusion that J.Z.'s attachment to Mother was not significant enough to overcome the security and the sense of belonging adoption would confer on him.  In sum, the juvenile court did not abuse its discretion when it found severing J.Z.'s relationship with Mother would not be so detrimental as to outweigh the benefits of adoption.

### DISPOSITION

The order terminating Mother's parental rights is affirmed.

KELETY, J.

WE CONCUR:

HUFFMAN, Acting P. J.

BUCHANAN, J.